UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DAMIEN L. BREWER,

                Petitioner,                  Case No. 1:05-cv-118

v.                                         Honorable Wendell A. Miles

JOHN CASON,

                Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner was convicted in the Calhoun County Circuit Court of armed robbery, MICH. COMP. LAWS § 750.529; assault with intent to rob while armed, MICH. COMP. LAWS § 750.89; first-degree home invasion, MICH. COMP. LAWS § 750.110a(2); and four counts of possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b.  On January 10, 2002, the trial court sentenced Petitioner to concurrent prison terms of 480 to 840 months on the armed robbery, assault and home invasion convictions, and two-year terms for each of the felony-firearm convictions.  In his *pro se* petition, Petitioner raises five grounds for relief, as follows:

I.      APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS WHEN THE PROSECUTOR FAILED TO AFFORD DEFENSE COUNSEL DISCOVERY UNTIL TRIAL.

II.     APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS WHEN THE EVIDENCE IN HIS CASE WAS CO-MINGLED WITH THE EVIDENCE OF CHARGES AGAINST A CO-PARTICIPANT.

III.    APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS AND HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO EARLY MOVE FOR A DNA EXPERT AND FAILED TO REQUEST AN EVIDENTIARY HEARING REGARDING LATE PRODUCTION OF EVIDENCE OR SEEK A CONTINUANCE FOR THAT PURPOSE.

IV.    APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS WHEN THE COURT DENIED [SIC] MOTION BY APPELLATE COUNSEL FOR FUNDS TO RETAIN A DNA/SEROLOGICAL EXPERT.

V.    APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO BE FREE FROM DOUBLE JEOPARDY.

Respondent has filed an answer to the petition (docket #14) stating that the grounds should be denied because they are without merit.  Upon review and applying the AEDPA standards, I find that Petitioner is not entitled to habeas corpus relief.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.  Trial Court Proceedings

The state prosecution arose from the robbery of the residence of LaTino Warren and Gary Carlton at 198 Euclid Street in Emmett Township.  Petitioner and Bobby Sisler were accused of committing the robbery.  Petitioner was tried separately before a jury in the Calhoun County Circuit Court on December 4-7, 2001.[1]

---

[1] The trial transcripts will be identified as follows:
Tr. I      December 4, 2001
Tr. II     December 5, 2001
Tr. III    December 6, 2001
Tr. IV    December 7, 2001.

Latino (Tina) Warren testified that on May 13, 2001, she lived at 198 Euclid Street with her boyfriend, Gary Carlton, and her two young children.  (Tr. I, 137-38.)  Warren's bedroom was in the living room.  (Tr. I, 139.)  At about 3:00 a.m., Warren was awakened by knocking at the front door.  She could hear someone asking Carlton for a phone number for a person named "Adam."  (Tr. I, 142-43.)  Carlton went to the dining room to write down the phone number.  (Tr. I, 144.)  Warren heard kicking at the door and someone say, "This is a jack; move Bitch . . .", as two men burst through the front door into the living room.  (Tr. I, 144-46.)  Warren knew the term "jack" to mean a theft or robbery.  (Tr. I, 145.)  One of the robbers was Caucasian and the other was African American.  (Tr. I, 146.)  Warren identified Petitioner as the African-American man.  (Tr. I, 154-55.)  Warren testified that the two robbers went toward the dining room and confronted Carlton.  (Tr. I, 146.)  The white male, later identified as Bobby Sisler, demanded money.  (Tr. I, 148.)  Warren did not know Bobby Sisler, but was acquainted with his brother, Billy Sisler.  (Tr. I, 148-49.)  Sisler then moved toward Warren, while Petitioner continued to demand money from Carlton.  (Tr. I, 150.)

Warren, who was still sitting on her bed in the living room, picked-up her purse from the floor and clutched it to her chest.  (Tr. I, 157-58.)  Sisler saw Warren's purse and yelled to Petitioner "the purse is in here; the money is in here."  (Tr. I, 158-59).  Warren resisted when Sisler tried to take her purse.  (Tr. I, 160.)  When Warren refused to let go of her purse, Sisler struck her in the head with a hard object, which she believed to be an empty beer bottle.  (Tr. I, 161-62.)  Petitioner came into the living room and demanded that Warren let go of her purse.  (Tr. I, 161, 164.)  Warren could see that Petitioner was holding a gun in his right hand.  (Tr. I, 164-66.)  When Warren still refused to let go of her purse, Petitioner struck her in the head with the gun at least once.  (Tr. I, 166, 190.)  Petitioner also threatened to shoot Carlton if she did not give him her purse.  (Tr. I, 168.)

- 3 -

Warren saw Petitioner's hand go back as if he was preparing to strike her again and then the gun went off. (Tr. I, 168.) Warren, who was dazed and bleeding profusely from her head, lost control of her purse. (Tr. I, 167, 173, 180.) She heard the door slam as the two robbers left the house. (Tr. I, 179.)

Warren testified that she had two open cuts on her head. (Tr. I, 173.) There was blood all over her bedding, on the living room walls and blinds, and in the bathroom where she went to get something to put against her head. (Tr. I, 175.) Warren found two pieces of her purse strap on the floor after the incident, but never saw her purse again. (Tr. I, 172.) She had $200 in her purse at the time of the robbery because she had just been paid. (Tr. I, 161.) Warren was taken to the hospital where she received a total of twelve stitches in her head. (Tr. I, 176-77.) Warren picked Petitioner out of a lineup at the sheriff's department. (Tr. I, 184.)

Gary Carlton's testimony was consistent with Warren's version of the events. Carlton was sleeping when someone started knocking on the front door. Carlton went to the door and asked who was there. A person outside responded, "Bobby." (Tr. I, 209.) Carlton knew Billy Sisler and had met his brother, Bobby Sisler, four or five times over the years. (Tr. I, 205.) Carlton assumed that it was Bobby Sisler, but thought it was strange for him to come to the door in the middle of the night. (Tr. I, 209.) When Carlton asked what he wanted, Sisler responded that he wanted Adam's phone number. (Tr. I, 210.) Carton told him the number through the door. (Tr. I, 210.) Four or five minutes later, Sisler came back to the door and asked Carlton to write down the number for him. (Tr. I, 210.) Carlton told him to wait and walked to the dining room to write down the number. (Tr. I, 211.) While he was in the dining room, Carlton heard two loud bangs and then saw Bobby Sisler come through the door. (Tr. I, 212.) Carlton recognized him from their previous meetings.

- 4 -

(Tr. I, 212.)  Sisler was yelling, "this is a jack move." (Tr. I, 213.)  Sisler came toward Carlton with raised fists shouting "Give me your money.  Give me your money."  (Tr. I, 214-15.)  Carlton told Sisler that he did not have anything.  (Tr. I, 214.)

Carlton testified that an African-American man appeared behind Sisler and pointed a gun at Carlton's face.  (Tr. I, 215-16.)  The African-American man struck Carlton in the head with the gun.  (Tr. I, 219.)  Carlton struggled with the gunman and ended up on the kitchen floor.  (Tr. I, 220.)  Carlton heard Sisler yell something about a purse and the second robber left Carlton and went back toward the living room.  (Tr. I, 221.)  Carlton was dazed and bleeding from cuts in his head and face.  (Tr. I, 224.)  After a couple of minutes, Carlton struggled to his feet and walked into the dining room.  (Tr. I, 224.)  The African-American robber grabbed him and told him to sit on the bed in the living room.  (Tr. I, 225.)  Carlton saw the two robbers trying to wrestle the purse away from Warren.  (Tr. I, 225.)  Carlton heard the African-American robber yell for Warren to give up her purse or he was going to start shooting.  (Tr. I, 226.)  When he made the threat, he had the gun pointed up against Carlton's head.  (Tr. I, 227.)  The African-American robber hit Warren with the gun at least once.  (Tr. I, 226.)  As he brought the gun back over his head, Carlton grabbed the gun and it went off.  (Tr. I, 229.)  After the gun discharged, the two robbers ran out the front door.  (Tr. I, 230.)

The front door was jammed, so Carlton went out the window and went to a neighbor's house to call the police.  (Tr. I, 231.)  Carlton saw some pieces of the purse strap after the robbers left, but the rest of it was gone.  (Tr. I, 231.)  Carlton suffered injuries to his eye and jaw and had a large scratch on his forearm.  (Tr. I, 235.)  Carlton testified that the gun in evidence looked like the gun that the African-American man used during the robbery.  (Tr. I, 247-48.)

Emmett Township Police Officers Christopher Allen and Kenneth Cunningham were dispatched to the victims' residence at approximately 3:00 a.m. on May 13. (Tr. II, 3, 44.) Warren and Carlton, who both were bleeding from the face or head, screamed out the window to the officers. (Tr II, 7, 10-22, 45-46.) The door was jammed, but the officers were able to open it using some force. (Tr. II, 45.) When the officers entered the house, they noticed significant amounts of blood in the living room, kitchen and bathroom. (Tr. II, 8, 46-47.) They also observed a bullet hole in the south wall of the living room. (Tr. II, 8, 47.) Warren was crying and told the officer that she had been robbed. (Tr. II, 10-11.) The victims implicated Bobby Sisler as one of the robbers. (Tr. II, 12.) Warren gave Officer Allen a description of the African-American robber and the gun that he was carrying. (Tr. II, 12-14.) Officer Allen broadcasted a BOL (be on the lookout) to local law enforcement agencies concerning the suspects and weapon. Officer Cunningham, who was part of a canine team, attempted to track the robbers with his dog. (Tr. II, 47.) The dog tracked a scent for four or five blocks, to the intersection of Jericho and Kingman. (Tr. II, 47-49.)

Brian Berthoud of Life Care Ambulance Service was dispatched to the victims' residence. (Tr. II, 56.) The male victim had a v-shaped laceration above his left eye with swelling and bruising on the left side of his face. (Tr. II, 58.) The male refused treatment, so Berthoud turned his attention to the female victim. (Tr. II, 58.) The female had a laceration to her head and appeared distraught. She was transferred to the hospital for further treatment. (Tr. II, 59.)

Emmett Township Police Lieutenant Danny McCandlish was called to the scene by Officers Allen and Cunningham. (Tr. II, 62.) McCadlish took photographs at the scene. In the livingroom, he photographed blood-stained bedding and blood spatters on the south wall. (Tr. II, 64-67.) He also photographed what appeared to be two sections of purse strap that were laying in the bed. (Tr. II, 68.) Cunningham also took photos of blood on the dining room floor and table.

(Tr. II, 69.) He also found significant amounts of blood in the bathroom. (Tr. II, 69.) Several blood-stained items were collected for testing. (Tr. II, 70.) Police officers also removed a bullet from the south wall. (Tr. II, 52-54, 71.)

Shawn Coughlin testified that he was with Petitioner, who he called "D," on the morning of May 13. (Tr. II, 140-41.) Petitioner, who was driving, picked-up Bobby and Billy Sisler. (Tr. II, 141.) While they were driving around, Bobby Sisler said that he knew the guy at 198 Euclid. At first, Bobby talked about going there to buy drugs, but then said that he was going to rob him. (Tr. II, 142, 153.) Coughlin testified that Bobby Sisler and Petitioner got out of the car about a block away from Euclid. (Tr. II, 144.) Billy Sisler and Coughlin drove around for a little while and then parked near Euclid. (Tr. II., 145.) When Bobby and Petitioner got back into the car, Bobby said, "hurry up and let's go. I just did something crazy." (Tr. II, 147.) Coughlin was scared and asked to be dropped off at his mother's house. (Tr. II, 152.) Coughlin called Sergeant Madsen from his mother's house and told him what Bobby Sisler had done. (Tr. II, 140, 152.) Coughlin testified that he was drunk on the night of the robbery. (Tr. II, 155.) During a subsequent interview, Coughlin told Allen that the car they were driving in, a light blue Oldsmobile, belonged to Petitioner. (Tr. II, 148-50.) He also told Allen that he saw blood on Bobby's shoes and pant leg after he got back in the car. (Tr. II, 151.) Coughlin testified that he also saw a little bit of blood on Petitioner. (Tr. II, 156.) Coughlin was not charged with any crimes stemming from the robbery. (Tr. II, 158.)

Sergeant Todd Madsen of the Battle Creek Police Department testified that he received a call that the subjects involved in a robbery in Emmett Township were in a residence at 47 South 22nd Street. (Tr. II, 109.) Madsen arrived at the residence in an unmarked car at approximately 5:30 a.m. (Tr. II, 110.) He saw several subjects arguing in the driveway. Madsen recognized two of the subjects as Brent King and Billy Sisler. King was pointing a shotgun at Billy

Sisler.  (Tr. II, 110.)  While Madsen was outside, other officers entered the residence and took Bobby

Sisler and a black male into custody.  (Tr. II, 112.)

Battle Creek Police Officer Ken Millikin responded to a call by Sergeant Madsen

regarding a man with a gun at 47 South 22nd Street in Battle Creek.  (Tr. II, 90.)  Millikin assisted

in a search of the residence for a gun that was believed to be used in the robbery.  (Tr. II, 92.)  He

found a 9 millimeter semi-automatic handgun in the tank of the toilet in the upstairs bathroom.

(Tr. II, 92-93.)

When the Emmett Township Police officers arrived at 47 South 22nd Street, Bobby

Sisler and Petitioner already were in custody.  (Tr II, 22, 42, 75.)  Officer Allen testified that

Petitioner fit the description that Warren had given of the black male suspect.  (Tr. II, 22-23.)  The

gun found in the toilet tank also fit the description given by Warren.  (Tr., II, 24.)  The magazine

contained five nine-millimeter rounds.  (Tr. II, 29.)  At the time of his arrest, Petitioner presented

a false Wisconsin driver's licence.  (Tr. II, 76-77.)

Emmett Township Police Officer Timothy Gothard inspected the outside of the

Oldsmobile parked in front of the residence at 27 South 22nd Street.  (Tr. II, 117.)  He observed what

appeared to be blood on the passenger-side rear door and window.  (Tr. II, 117.)  He also saw what

appeared to be several blood spots inside of the car.  (Tr. II, 118.)  Gothard obtained a search warrant

and collected blood samples from the car.  (Tr. II, 119-22.)  He also found 22 shell casings under the

back seat.  (Tr. II, 123.)

Gregory Michaud, a latent print examiner for the Michigan State Police, testified that

he recovered a partial latent print from the Budweiser bottle that may have been used to strike

Warren in the head.  (Tr. III, 7.)  Michaud could not positively match the latent print with the finger

- 8 -

prints taken from Petitioner and Bobby Sisler.  (Tr. III, 8.)  Michaud was not asked to test a gun for

fingerprints; however, he never had made an identification from an item removed from water.  (Tr.

III, 13-14.)

Jeffrey Nye of the Michigan State Police testified as an expert in the area of DNA

analysis and profiling.  (Tr. III, 19-24.)  Nye testified that Carlton was a major donor of the blood

found on the outside of the rear passenger-side door handle of the Oldsmobile.  (Tr. III, 35-36.)  The

blood found on the outside of the rear passenger-side window matched Warren's DNA.  (Tr. III, 37-

38.)  Warren also was the major contributor of blood found on the inside of the rear door.  (Tr. III,

38.)  In addition, Warren was the contributor of blood found on Bobby Sisler's jeans and shoe laces.

(Tr. III, 40-41.)  Nye could not obtain a complete DNA profile from the blood stains on Petitioner's

shorts and t-shirt, and, thus, could not make a conclusive match.  (Tr. III, 41-47.)  However, Nye

determined that Carlton was excluded as a contributor of the blood, but Warren could not be

excluded.  (Tr. III, 45-47.)

The parties stipulated to the admission of a ballistics report by Michael Burrett of the

Michigan State Police.  (Tr. II, 135.)  The report stated that the bullet remnant removed from the wall

of the victims' residence could have originated from the 9 millimeter hand gun that was recovered

at 47 South 22nd Street.  (Tr. II, 136.)  The mutilated condition of the bullet remnant and absence

of bullet jacket precluded a definitive classification of the specific caliber.  (Tr. II, 136.)

At the conclusion of trial on December 7, 2001, the jury found Petitioner guilty of

one count of armed robbery, one count of assault with intent to rob while armed, one count of first-

degree home invasion and four counts of felony-firearm.  (Tr. IV, 754.)

### B. Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals. His brief, which was filed by counsel on August 19, 2002, raised the same five issues as raised in this application for habeas corpus relief. (*See* Def.-Appellant's Br. on Appeal, docket #23.) By unpublished opinion issued on June 19, 2003, the Michigan Court of Appeals affirmed Petitioner's convictions, but remanded for correction of the judgment of sentence. (*See* 6/19/03 Mich. Ct. App. Opinion ("MCOA Op."), docket #23.)

Petitioner filed a *pro per* application for leave to appeal to the Michigan Supreme Court. Petitioner raised the same five claims rejected by the Michigan Court of Appeals. By order entered December 30, 2003, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed. (*See* Mich. Ord., docket #24.)

### <u>Standard of Review</u>

This action is governed by the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied, Texas v. Penry*, 126 S. Ct. 2862 (2006). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

- 10 -

established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply.  *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court

decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

## Discussion

I.     APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS WHEN THE PROSECUTOR FAILED TO AFFORD DEFENSE COUNSEL DISCOVERY UNTIL TRIAL.

In his first ground for habeas relief, Petitioner claims that his due process rights were violated when the prosecutor failed to provide defense counsel with copies of the DNA test results until the first day of trial. Plaintiff maintains that the discovery violation was akin to the suppression of material evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).

In rejecting Petitioner's claim on appeal, the Michigan Court of Appeals stated:

Defendant first argues that the fact that he did not receive copies of the results of DNA testing conducted by the state police laboratory until shortly before trial constituted a discovery violation. We review a trial court's decision as to the appropriate remedy for noncompliance with a discovery order for an abuse of discretion. *People v Davie (After Remand),* 225 Mich App 592, 597-598; 571 NW2d 229 (1997). As the trial court indicated, it appears that the long delay in receiving the test results occurred simply because the state police laboratory conducts many DNA

- 12 -

tests. There is no indication that either the prosecution or the state police sought to deny defendant access to these test results in order to disadvantage defendant at trial. Further, we fail to discern any significant prejudice to defendant because defense counsel knew that DNA testing was being conducted and should have been prepared for the possibility that it would link Warren and Carlton to the automobile and clothing samples. Thus, the trial court did not abuse its discretion by failing to sanction for a discovery violation in this regard. We note that case law defendant cited pertaining to the prosecution withholding exculpatory evidence is inapposite because the DNA test results did not tend to exculpate defendant.

(MCOA Op., 3.)

To the extent Petitioner contends that the prosecutor violated state discovery rules, his claim generally involves an issue of state law that is not cognizable in a federal habeas corpus proceeding. *See Estelle v. McGuire,* 502 U.S. 62, 67-68 (1991)*; see also Colston v. Burke*, 37 F. App'x 122, 125 (6th Cir. 2002); *King v. Trippett,* 27 F. App'x 506, 508 (6th Cir. 2001). Petitioner also asserts a *Brady* violation. "*Brady v. Maryland* requires disclosure only of evidence that is both favorable to the accused and 'material either to guilt or innocence.'" *United States v. Bagley,* 473 U.S. 667, 675 (1985) (quoting *Brady v. Maryland,* 473 U.S. 83, 87(1963)). Evidence is favorable to the accused if it exculpates the accused or enables the accused to impeach witnesses. *Id.* at 676. Evidence is material to guilt or innocence "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* at 682.

The Michigan Court of Appeals rejected Petitioner's *Brady* claim "because the DNA test results did not tend to exculpate defendant." Petitioner maintains that the DNA evidence was exculpatory because the prosecutor's expert could not obtain a complete DNA profile from the blood stains on Petitioner's shorts and t-shirt, and, thus, could not make a conclusive match to either of the victims. (Tr. III, 41-47.) However, taking the evidence at trial as a whole, the DNA evidence was more inculpatory than exculpatory. Warren's blood was found on Bobby Sisler's jeans and shoe

- 13 -

laces.  (Tr. III, 40-41.)  Blood from both of the victims was found on the outside and the inside of

the Oldsmobile that was parked in front of the residence in Battle Creek where Petitioner and Sisler

were arrested.  (Tr. III, 35-38.)  Considerable evidence was presented at trial that Petitioner and

Bobby Sisler committed the robbery together.  For example, one victim positively identified

Petitioner as the African-American robber, while the other positively identified Sisler as the

Caucasian robber.  (Tr I, 154-55, 212.)  Shawn Coughlin also gave damaging testimony that

Petitioner and Sisler acted together in committing the robbery and that Petitioner's Oldsmobile was

used as the getaway car.  (Tr II, 140-156).  In light of this evidence, the DNA evidence linking Sisler

and the car to the victims constituted strong circumstantial evidence against Petitioner.  Moreover,

while a match could not be made, human blood was found on the clothing Petitioner was wearing

at the time of his arrest.

Even assuming the evidence was exculpatory, Petitioner cannot establish a *Brady*

violation because the evidence was disclosed by the prosecution before the trial began.  *Brady*

generally does not apply to delayed disclosure of exculpatory information, but only to a complete

failure to disclose, and a delay only violates *Brady* when the delay itself causes prejudice.  *United*

*States v. Blackwell*, No. 05-4588, __ F.3d __,  2006 WL 2471965, *11 (6th Cir. Aug. 29, 2006)

(citing *United States v. Blood,* 435 F.3d 612, 627 (6th Cir. 2006)  (quotation marks omitted); *Farrell*

*v. U.S.*, 162 F. App'x 419, 424 (6th Cir. 2006) ("[T]ardy disclosures of *Brady* material do not violate

the defendant's constitutional rights unless he can demonstrate the delay denied him a

constitutionally fair trial.")  Petitioner's argument that the belated disclosure of the DNA report

prejudiced the entire defense is meritless.  Petitioner used the DNA evidence to support his defense

theory that he did not participate in the robbery with Bobby Sisler and was misidentified by Warren.

Petitioner provides no explanation of how earlier disclosure of the evidence would have altered his defense or affected the outcome of the case. Accordingly, the decision of the Michigan Court of Appeals was not an unreasonable application of *Brady*.

II. APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS WHEN THE EVIDENCE IN HIS CASE WAS CO-MINGLED WITH THE EVIDENCE OF CHARGES AGAINST A CO-PARTICIPANT.

Petitioner claims that the proofs against Bobby Sisler were so intermingled with the proofs against Petitioner as to deprive Petitioner of a fair trial. For example, Petitioner cites the DNA evidence, which conclusively linked Bobby Sisler to both of the victims, but failed to produce any conclusive evidence linking Petitioner to the victims. Petitioner contends that the "DNA evidence effectively tarred Petitioner with Bobby's guilt." Petitioner also cites the testimony of Shawn Coughlin, which he claims was relevant in the case against Bobby Sisler, but was minimally relevant in his case such that any probative value was outweighed by the danger of unfair prejudice. In rejecting Petitioner's claim on appeal, The Michigan Court of Appeals stated:

> Defendant next argues quite vaguely that the admission of evidence, particularly DNA evidence, indicating Bobby's involvement in the offenses improperly "co-mingled" evidence against Bobby with evidence against defendant. As defendant acknowledges, this issue was not preserved below. Thus, we may grant relief only for plain error that resulted in the conviction of an actually innocent defendant or that seriously affected the fairness, integrity, or public reputation of judicial proceedings. *People v Carines,* 460 Mich 750, 763-764, 774; 597 NW2d 130 (1999). Defendant has not established any plain error in connection with this issue. Relevant evidence is generally admissible. MRE 402. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401.

> Contrary to the implication of defendant's position, the evidence linking Bobby to the crime, including DNA evidence and Carlton's testimony identifying Bobby as one of the assailants, was, when considered with other evidence, relevant

as making it more probable that defendant was also involved in the crime. As set forth above, police found defendant at the same address as Bobby within hours of the incident, and Warren identified defendant as one of the assailants. Accordingly, evidence implicating Bobby was relevant to buttress the plausibility of Warren's identification of defendant as the other assailant given the evidence that defendant was with Bobby shortly after the crimes. Further, the DNA evidence was relevant because it tended to corroborate the truthfulness of Carlton's testimony implicating Bobby. In this regard, the relevancy of the evidence implicating Bobby must be considered in the context of the other evidence offered at trial. See *People v Brooks,* 453 Mich 511, 519; 557 NW2d 106 (1996), quoting 1 McCormick, Evidence (4th ed), § 185, p 776 (discussing the concept that an item of evidence "being but a single link in the chain of proof, need not prove conclusively the proposition for which it is offered" and using the analogy that "[a] brick is not a wall"). While as defendant indicates, a trial court may exclude evidence under MRE 403 on the ground that its probative value is substantially outweighed by the danger of unfair prejudice, it is readily apparent that the evidence implicating Bobby was highly relevant to the charges against defendant so that its probative value was not substantially outweighed by any danger of unfair prejudice. Defendant has not shown plain error to warrant relief based on this issue.

(MCOA Op., 3-4.)[2]

The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. at 67-68, an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated

---

[2] The Michigan Court of Appeals found that Petitioner failed to preserve his claim for appellate review. When a state-law default prevents further state consideration of a federal issue, the federal courts are precluded from considering that issue on habeas corpus review unless the petitioner can demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result in a fundamental miscarriage of justice. *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006)*; Murray v. Carrier*, 477 U.S. 478, 495 (1986). Because Respondent did not raise procedural default and the issue easily can be resolved on the merits, I will assume without deciding that there was no procedural default by Petitioner and decide the merits of the case. *See Binder v. Stegall*, 198 F.3d 177, 178 (6th Cir. 1999).

the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003).

Petitioner was not denied a fair trial as a result of the evidence admitted at trial inculpating Bobby Sisler. While Petitioner was tried separately from Sisler, Petitioner was not entitled to be tried in a vacuum. Petitioner and Sisler were accused of acting together in committing the robbery at 198 Euclid Street. As discussed in the previous section and thoroughly explained by the Michigan Court of Appeals, the DNA evidence against Sisler was highly relevant to Petitioner's guilt. Moreover, Shawn Coughlin's testimony was highly incriminating against both Sisler and Petitioner. Coughlin testified that while he was driving around with Petitioner, Bobby Sisler and Billy Sisler in the early morning hours of May 13, Bobby stated that he knew the guy at 198 Euclid and was going to rob him. (Tr. II, 141.) Coughlin testified that Bobby Sisler and Petitioner got out of the car about a block away from Euclid. (Tr. II, 144.) Billy Sisler and Coughlin drove around for a little while and then parked near Euclid. (Tr. II., 145.) When Bobby and Petitioner got back into the car, Bobby said, "hurry up and let's go. I just did something crazy." (Tr. II, 147.) Coughlin testified that he observed blood on both Sisler and Petitioner. (Tr. II, 151, 156.) Accordingly, Petitioner's claim is without merit.

III.   APPELLANT WAS DEPRIVED OF HIS   FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS AND HIS SIXTH AMENDMENT RIGHT TO THE EFFECTIVE ASSISTANCE OF COUNSEL WHEN HIS TRIAL COUNSEL FAILED TO EARLY MOVE FOR A DNA EXPERT AND FAILED TO REQUEST AN EVIDENTIARY HEARING REGARDING LATE PRODUCTION OF EVIDENCE OR SEEK A CONTINUANCE FOR THAT PURPOSE.

Petitioner claims that his counsel was ineffective for failing to retain a DNA expert for purposes of challenging or discrediting the DNA evidence presented by the prosecution.  He further claims that counsel was ineffective for failing to request an evidentiary hearing concerning the late production of the DNA evidence.

In *Strickland v. Washington*, 466 U.S. 668, 687-88  (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.  To establish prejudice, the "[t]he defendant must show

- 18 -

that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Moving directly to *Strickland*'s prejudice prong, the Michigan Court of Appeals found that Petitioner failed to sustain his burden:[3]

> We conclude that defendant has not established his ineffective assistance of counsel claim because there is no reasonable probability that he could have discredited the DNA evidence presented by the prosecution with the effect of obtaining an acquittal of the crimes of which he was convicted. Apart from the DNA evidence, Warren identified defendant as one of the assailants, and Carlton identified Bobby as the other. Bobby and defendant were found at the same address within hours of the incident. As a practical matter, if the DNA evidence implicating Bobby and to a somewhat lesser extent defendant, in the incident were inaccurate, then either Carlton was lying or mistaken in identifying Bobby as one of the assailants. It would be an extraordinary coincidence if the DNA testing were flawed, Carlton's identification were incorrect, and Bobby and defendant were found together with blood on their clothing within hours of the incident. Accordingly, we conclude that there is no reasonable probability that different action by trial counsel with regard to the DNA evidence would have resulted in a different outcome at trial in light of the strong evidence of guilt. Thus, defendant has not established his claim of ineffective assistance of counsel.

(MCOA Op., 4.)

"When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697), *cert. denied*, 543 U.S. 1119 (2005). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."

---

[3] In his supporting memorandum, Petitioner argues that because the Michigan Court of Appeals cited *Lockhart v. Fretwell*, 506 U.S. 364 (1993) rather than *Strickland v. Washington*, 466 U.S. 668 (1984), it failed to apply the proper standard of review to his claim of ineffective assistance of counsel. Petitioner is mistaken. In *Lockhart*, the Supreme Court discussed the *Strickland* standard at length and applied the standard in reaching its determination. Accordingly, *Lockhart* is an appropriate source of Supreme Court authority regarding claims of ineffective assistance of counsel.

*Strickland*, 466 U.S. at 697.  As summarized above by the Michigan Court of Appeals, the prosecutor presented substantial evidence of Petitioner's guilt aside from the DNA evidence.  As a result, Petitioner cannot show a reasonable probability that he would have been acquitted of the offenses for which he was convicted but for his counsel's failure to retain an DNA expert or to challenge the late production of the DNA evidence.  Accordingly, I cannot find that the decision of the Michigan Court of Appeals was an unreasonable application of *Strickland*.

IV.    APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS OF DUE PROCESS WHEN THE COURT DENIED [SIC] MOTION BY APPELLATE COUNSEL FOR FUNDS TO RETAIN A DNA/SEROLOGICAL EXPERT.

Petitioner claims that the trial court abused its discretion and violated his right to due process by denying his request for funds to retain a DNA expert on appeal.  He contends that without oversight by a defense expert the prosecutor's expert may have grossly mischaracterized and overstated serological evidence implicating him.  The Michigan Court of Appeals concluded that Petitioner's rights were not violated because there was no reasonable probability that appointment of a defense DNA expert would have benefitted the defense.  The court of appeals stated:

> Defendant argues that the trial court violated his constitutional right to due process by denying his post-trial motion for funds to retain a DNA expert. We disagree. The trial court denied defendant's post-trial request for a DNA expert stating that it was "not convinced of the need" (Hearing, 6/17/02, pp 5-6). Assuming for purposes of discussion that the due process right to receive expert assistance in certain circumstances extends to post-trial proceedings, a defendant must show that there is a reasonable probability that appointment of an expert would benefit the defense. See *People v Tanner*, 255 Mich App 369, 397-398; 660 NW2d 746 (2003), quoting *People v Leonard*, 224 Mich App 569, 582; 569 NW2d 663 (1998), quoting *Moore v Kemp*, 809 F2d 702, 712 (CA 11, 1987). For the reasons discussed in the preceding issue, there is no reasonable probability that appointment of a defense DNA expert would have benefitted the defense. Thus, the trial court did not violate defendant's right to due process by denying his post-trial motion for appointment of a DNA expert.

(MCOA Op. at 5.)

The Supreme Court has recognized the general principle that the government must provide indigent defendants with the "basic tools of an adequate defense or appeal, when those tools are available for a price to other prisoners." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971); *see Douglas v. California*, 372 U.S. 353, 357-58 (1963); *Griffin v. Illinois*, 351 U.S. 12, 18-19 (1956) (plurality opinion). Although the government need not purchase for the indigent defendant all the assistance that a wealthier defendant might buy, fundamental fairness requires that indigent defendants have "an adequate opportunity to present their claims fairly within the adversary system." *Ross v. Moffitt*, 417 U.S. 600, 612 (1974). In *Ake v. Oklahoma*, 470 U.S. 68 (1985), the Supreme Court held that as part of the basic tools of an adequate defense, an indigent defendant has a due process right to the appointment of a psychiatrist to assist him in his defense when he "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." *Id.* at 83. Shortly after deciding *Ake*, the Supreme Court declined to extend *Ake*'s holding to the appointment of a criminal investigator, fingerprint expert, and ballistics expert and declined to address the question of "what if any showing would [entitle] a defendant to [private non-psychiatric] assistance" as a matter of federal constitutional law. *Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985) (emphasis added); *see also Hawkins v. Mullins*, 291 F.3d 658, 671 (10th Cir. 2002) (construing *Caldwell* as declining to extend the *Ake* holding); *Weeks v. Angelone*, 176 F.3d 249, 264-65 (4th Cir. 1999) (same).

In habeas corpus cases decided before the enactment of the AEDPA, federal circuit courts, including the Sixth Circuit, extended *Ake* to non-psychiatric experts. For example, in *Terry v. Rees*, 985 F.2d 283, 284 (6th Cir. 1993), the Sixth Circuit held that the petitioner was deprived of the opportunity to present an effective defense when he was denied an independent pathologist

in order to challenge the government's position as to the victim's cause of death.  With the enactment of the AEDPA in 1996, the petition for writ of habeas corpus may be granted only if the decision of the state court "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States."  Many federal circuit courts have acknowledged that the  Supreme Court has not explicitly extended *Ake* to non-psychiatric experts.  *See Conklin v. Schofield*, 366 F.3d 1191, 1206 (11th Cir. 2004) ("[T]he Supreme Court has not yet extended *Ake* to non-psychiatric experts."), *cert. denied*, 125 S. Ct. 1703 (2005); *Hawkins*, 291 F.3d at 671 (the Supreme Court has not "specifically" extended *Ake* to investigators and other experts).  Therefore, it is an open question whether the holding in *Ake* applies to requests for non-psychiatric experts.  *See Briseno v. Cockrell*, 274 F.3d 204, 208-10 (5th Cir. 2001) (recognizing that it remains an unsettled question whether the holding in *Ake* applies to requests for expert assistance outside the field of psychiatry).  Because the Supreme Court has not explicitly extended *Ake* to require the appointment of non-psychiatric experts, Petitioner cannot show that the failure to provide funds for a DNA expert was contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

     V.     APPELLANT WAS DEPRIVED OF HIS FIFTH AND FOURTEENTH AMENDMENT RIGHTS TO BE FREE FROM DOUBLE JEOPARDY.

On direct appeal, Petitioner argued that his convictions for first-degree home invasion, armed robbery and assault with intent to rob while armed violated his right against double jeopardy.  He argued that with two victims, only two of the three convictions could stand.  The court of appeals rejected his claim, stating:

> Defendant argues that his conviction of both armed robbery, MCL 750.529,
> and assault with intent to rob while armed, MCL 750.89, violate his constitutional

- 22 -

right to be free of double jeopardy. We disagree because each conviction involved a different victim. Warren was the victim of the armed robbery charge of which defendant was convicted, while Carlton was the victim of the assault with intent to rob while armed charge. As the prosecution notes, "double jeopardy does not apply to crimes committed against different victims, even if the crimes occurred during the same criminal transaction." *People v Hall,* 249 Mich App 262, 273; 643 NW2d 253 (2002), remanded on other grounds 467 Mich 888 (2002). Thus, defendant's convictions of both armed robbery and assault with intent to rob while armed did not constitute a double jeopardy violation in the present circumstances.

We note that defendant also vaguely refers to his first-degree home invasion conviction in connection with his double jeopardy argument. However, we do not read defendant's brief as setting forth a claim that being convicted of home invasion, along with his other convictions in this case, constituted a double jeopardy violation. Nevertheless, we note that the home invasion statute specifically provides that "[i]mposition of a penalty under this section does not bar imposition of a penalty under any other applicable law." MCL 750.110a(9). In this multiple punishment context, "the double jeopardy analysis is whether there is a clear indication of legislative intent to impose multiple punishment for the same offense. If so, there is no double jeopardy violation." *People v Mitchell,* 456 Mich 693, 695-696; 575 NW2d 283 (1998). Thus, the Legislature has clearly indicated—indeed flatly stated—its intent to allow multiple punishment for both a first-degree home invasion and another crime committed during the same criminal transaction. Accordingly, double jeopardy is not an issue where defendant was convicted of first-degree home invasion along with his other convictions.

(MCOA Op., 5-6.) While the court of appeals rejected Petitioner's double jeopardy claim, it noted

the following error in the judgment of sentence concerning the number of counts for which Petitioner

was convicted:

Finally, we note that the judgment of sentence incorrectly indicates that defendant was convicted of two counts each of assault with intent to rob while armed, first-degree home invasion, and felony-firearm. Defendant was actually convicted of one count each of assault with intent to rob while armed and first-degree home invasion (as well as one count of armed robbery as correctly indicated in the judgment of sentence) and four counts of felony-firearm. Thus, we remand for correction of the judgment of sentence to accurately reflect these convictions. MCR 7.216(A).

(MCOA Op., 6.) Accordingly, the court of appeals remanded Petitioner's case to the circuit court

for correction of the judgment of sentence.

- 23 -

In his application for habeas corpus relief, Petitioner's double jeopardy argument concerns only the errors in the judgment of sentence. Petitioner claims that he has not been notified or provided a copy of the corrected judgment of sentence. However, according to the docket record in Petitioner's criminal case, an amended judgment of sentence was entered by the Calhoun County Circuit Court on October 1, 2003. (*See* Calhoun County Register of Actions, docket #17, entry #114.) The amended judgment correctly reflects the offenses for which Petitioner was convicted: one count of armed robbery, one count of assault with intent to rob while armed, one count of first-degree home invasion and four counts of felony-firearm. (Tr. V, 754.) A copy of the amended judgment of sentence is appended to this report and recommendation.

## **Recommended Disposition**

For the foregoing reasons, I recommend that the habeas corpus petition be denied.

Date: September 20, 2006        /s/ Ellen S. Carmody
                                   ELLEN S. CARMODY
                                   United States Magistrate Judge

## **NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b). Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).